```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA
                Civil No. 14-686(DSD/TNL)
```

Humberto Campis Abarca,

       Plaintiff,

v.                                                        **ORDER**

Patrick Little, an Individual
and Chief Executive Officer of
L & K Landscaping, Inc., a
Minnesota corporation; L & K
Tree & Shrub, Inc., a Minnesota
corporation; Deborah Little an
Individual and Chief Executive
Officer of L & K Tree & Shrub,
Inc.; Michael Kuka, an Individual
and Co-Owner of L & K Landscaping,
Inc. and L & K Landscaping, Inc.,

       Defendants.

    Angela Bortel, Esq. and the Bortel Firm, LLC, 825
    Nicollet Mall, Suite 811, Minneapolis, MN 55402, counsel
    for plaintiff.

    Robin E. Shea, Esq. and Constangy, Brooks & Smith, LLP,
    100 North Cherry Street, Suite 300, Winston-Salem, NC
    27101 and Ellen A. Brinkman, Esq. and Briggs & Morgan,
    PA, 80 South Eighth Street, Suite 2200, Minneapolis, MN
    55402, counsel for defendants.

    This matter is before the court upon the motion to dismiss by defendants Patrick Little, L&K Landscaping, Inc., L&K Tree & Shrub, Inc., Deborah Little, and Michael Kuka.  Based on a review of the file, record, and proceedings herein, and for the following reasons, the court grants the motion.

**BACKGROUND**

This human rights case arises out of plaintiff Humberto Campis Abarca's employment relationship with defendants. Campis is a Mexican national who speaks limited English. Am. Compl. ¶ 13. Patrick Little owns and operates L&K Landscaping, Inc. and L&K Tree & Shrub, Inc., along with his wife, Deborah Little, and their business partner Michael Kuka. Id. ¶¶ 6-10.

In approximately 2000, Patrick Little offered Campis employment with L&K Tree & Shrub in St. Michael, Minnesota and promised to obtain a work visa for him. Id. ¶¶ 7-8, 14-15. Little instructed Campis to return to Mexico to get the visa and loaned him money to support his family in the interim. Id. ¶¶ 16-17. In December 2001, Campis appeared at the U.S. Consulate in Mexico for a visa interview arranged by Little. Id. ¶ 18. Campis was denied a visa because of prior illegal entries into the United States. Id. When Campis called Little to tell him about the denied visa, Little told him that he needed to return to Minnesota to pay off the loan. Id. ¶ 19. Little also told Campis that he would pay for Campis's illegal entry into the United States and arrange for a legal visa the following year. Id. Little paid for a coyote to smuggle Campis into the United States. Id. ¶¶ 20-21. When Campis arrived in Minnesota in April 2002, Little told him that he would have to work off the loan and the cost of the coyote. Id. ¶ 21. Little did not disclose the total amount of the debt. Id.

2

Campis alleges that Little treated him poorly over the next year, yelling at him and threatening to hit him. Id. At some point, Little instructed Campis to return to Mexico to secure a visa. Id. ¶ 22. Campis did so, but the visa was again denied and Campis was told that he would have to wait five years to submit another visa application. Id. ¶ 23. Campis illegally returned to the United States to work for defendants. Id. Little again paid for the trip from Mexico and added the cost to Campis's debt. Id. ¶¶ 22-24. Little told Campis that he had to pay off the debt and that if he failed to do so, Little would find him in Mexico. Id. ¶ 24. Little continued to refuse to disclose the debt amount to Campis. Id. ¶ 24. This cycle repeated each year; Campis would go back to Mexico in December and return to the United States in April. Id. ¶ 28.

When in the United States, Campis and defendants' other employees lived in housing provided by defendants. Id. ¶ 33. Campis alleges that the living conditions were poor. For example, there were porta-potties instead of bathrooms, no showers, no consistent running water, bunk beds crammed in a small hallway to accommodate 25 people, rats, and no climate control. Id. ¶¶ 33-34. The employees paid $100 per month in rent to Little. Id. ¶ 35. The other employees routinely asked Campis to talk to Little about their living conditions because they were afraid to do so. Id. ¶ 32. Campis asked Little many times about renting another house

3

for employees and each time Little threatened to send Campis and the others back to Mexico. Id. ¶ 36.

Campis alleges that defendants required him to work 11-12 hours each day with few breaks and little pay, pay for his own food, and pay part of the cost of a shared vehicle. Id. ¶¶ 38-40, 43, 48. Campis also alleges that Little was verbally abusive and intimidating, even brandishing a gun on several occasions. Id. ¶¶ 37, 50. The working conditions were also unsafe, and Campis complained to Little, to no avail. Id. ¶ 47.

In December 2007, Little instructed Campis to return to Mexico, but he had no money to travel so he stayed in defendants' housing. Id. ¶ 53. Little and Kuka threatened Campis until he finally left on approximately March 12, 2008. Id. ¶¶ 54, 56. In May 2008, Campis's family received threatening phone calls in Mexico, the content of which are not described in the complaint. Id. ¶ 59. Campis alleges that the calls were made on Little's behalf. Id. ¶¶ 59, 61.

Campis reported defendants to the Department of Labor (DOL) in approximately 2008 and the DOL conducted an on-site investigation. Id. ¶¶ 58, 62, 64. In 2012, the DOL certified Campis as a victim of peonage, finding that he was held against his will and forced to work to satisfy the debt through threats and coercion. Id. ¶ 64.

On March 30, 2013, United States Citizenship and Immigration Services granted Campis a T visa, recognizing him as a victim of trafficking. Id. ¶ 65.

On March 11, 2014, Campis filed this suit. Campis then filed an amended complaint on July 14, 2014, alleging claims (1) under the Trafficking Victims Protection Reauthorization Act (TVPRA), (2) for fraud and fraudulent inducement, (3) for negligence per se, (4) for negligent infliction of emotional distress, (5) for unjust enrichment, (6) for breach of contract, (7) for vicarious liability, (8) under Minn. Stat. § 609.284, subd. 2, and (9) for negligent hiring, retention, direction, and supervision. Defendants move to dismiss.

I.   **Standard of Review**

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff [has pleaded] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)). Although a complaint need not contain detailed factual allegations, it must raise a right to relief above the speculative

5

level.  Twombly, 550 U.S. at 555.  "[L]abels and conclusions or a formulaic recitation of the elements of a cause of action" are not sufficient to state a claim.  Iqbal, 556 U.S. at 678 (citation and internal quotation marks omitted).

**II. TVPRA**

In Counts, I-IV and XIII, Campis alleges that defendants violated various provisions of the TVPRA by trafficking him into the United States, forcing him to work through threats, coercion, and indebtedness, and subjecting him to unsafe working conditions and uninhabitable living conditions.  The TVPRA, as amended, provides a civil remedy for victims of forced labor, slavery, involuntary servitude, human trafficking, and peonage.[1]  18 U.S.C. § 1595; see also id. §§ 1581, 1583, 1584, 1589, 1590.

Defendants argue that these claims are time barred under a four-year limitations period.  Campis responds that the TVPRA's 2008 amendment, which expands the limitations period to ten years, applies.  Campis also argues that even if the four-year period applies, the statute should be equitably tolled to allow his claims to proceed.

**A.   Retroactive Application**

Congress did not include a limitation provision when it first enacted the TVPRA in 2000.  Instead, a four-year limitations period

---

[1] Campis's involuntary servitude claim is brought under the Thirteenth Amendment through its enabling statute, 18 U.S.C. § 1584.

6

attached to the TVPRA under the federal "catch all" statute of limitations. 28 U.S.C. § 1658(a). On December 23, 2008, Congress amended the TVPRA to include a ten-year limitations period for civil actions. 18 U.S.C. § 1595(c).

Because Congress amended the TVPRA after the events at issue, the court must consider whether the new limitations period can be retroactively applied. "[A] presumption against retroactive legislation is deeply rooted in our jurisprudence." Owner-Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc., 339 F.3d 1001, 1006 (8th Cir. 2003) (quoting Landgraf v. USI Film Prods., 511 U.S. 244, 265 (1994)). "The presumption arises because '[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly.'" In re ADC Telecomms., Inc. Sec. Litig., 409 F.3d 974, 976 (8th Cir. 2005) (citation omitted). The court must first determine if Congress "expressly prescribed the statute's intended reach." Id. "If Congress has prescribed the reach, there is no need to resort to judicial default rules." Id. (citation and internal quotation marks omitted).

If Congress has not expressly prescribed the statute's reach, the court must "examine whether the statute would have a retroactive effect; that is, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already

completed."[2] Id. (citation and internal quotation marks omitted). If applying the statute retroactively would "alter a defendant's substantive rights," it has impermissible retroactive effect. Elbert v. True Value, Co., No. 07-3629, 2007 WL 4395626, at *2 (D. Minn. Dec. 11, 2007) (citation and internal quotation marks omitted).

Congress did not expressly state or otherwise indicate that the TVPRA limitations period applies retroactively.[3] Silence is insufficient to overcome the presumption against retroactivity. See Zarcon, Inc. v. NLRB., 578 F.3d 892, 896 (8th Cir. 2009) (citation omitted) (holding that when a statute contains no "express command" regarding its effective date, "it is not to be applied retroactively"); see also In re ADC Telecomms., Inc., Sec. Litig., 331 F. Supp. 2d 799, 803 (D. Minn. 2004) ("To have retroactive effect, the statutory language must be 'so clear that it could sustain only one interpretation.'"). Thus, the TVPRA does

---

[2] "The term retroactive effect refers not to the actual application of a new statute to previous conduct, but rather whether such application would have substantive effect." Popp Telcom, Inc. v. Am. Sharecom, Inc., No.96-1177, 2003 WL 1610789, at *2 n.1 (D. Minn. Mar. 20, 2003) (citation and internal quotation marks omitted).

[3] Defendants contend that Congress delayed the effective date of the new limitations period by 180 days and that this delay demonstrates intent that the statute only apply prospectively. The delayed effective date, however, applies only to Title IV of the amendment, which relates to child soldiers and does not apply to the provisions involved here. See William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044, § 407 (2008).

not evince congressional intent that the amendment apply to cases arising before its passage.

Even if Congress's intent were ambiguous, the amendment would have impermissible retroactive effect because it significantly broadens the basis for civil liability under the TVPRA. See Doe v. Siddig, 810 F. Supp. 2d 127, 135 (D.D.C. 2011) (quotation omitted) (stating that the amendment "represented a significant expansion of civil liability - 'an important legal consequence that cannot be ignored'"). Campis brings civil claims under TVPRA provisions that previously only imposed criminal liability, i.e., § 1581 (peonage), § 1583 (enticement into slavery), and § 1584 (involuntary servitude). See Pub. L. No. 110-457, 122 Stat. 5044, § 221(A). Retroactively applying the amendment would subject defendants to increased liability not contemplated when they engaged in the alleged conduct. As such, applying the amendment in this case would have an impermissible retroactive effect. See Ditullio v. Boehm, 662 F.3d 1091, 1100-1102 (9th Cir. 2011) (holding that the amended civil remedy provision of the TVPRA does not apply to pre-amendment conduct because permitting recovery would be an impermissible retroactive application of the statute); Siddig, 810 F. Supp. 2d at 135 (rejecting proposed retroactive application of the TVPRA because doing so would "increase a party's liability for past conduct"). Retroactively applying the new limitations period likewise would increase defendants' liability by exposing them to

civil liability when their alleged conduct otherwise would be time-barred. Under these circumstances, it is irrelevant that Campis's claims had accrued, but had not yet expired when Congress enacted the amendment. As a result, the TVPRA amendment may not be applied retroactively.[4]

### B.   Equitable Tolling

Campis argues that even if the four-year period applies, his claims should be equitably tolled. "The doctrine of equitable tolling permits a plaintiff to sue after the statutory time period has expired if he has been prevented from doing so due to inequitable circumstances." Pecoraro v. Diocese of Rapid City, 435 F.3d 870, 875 (8th Cir. 2006) (citation and internal quotation marks omitted). "Because statutes of limitations protect important interests of certainty, accuracy, and repose, equitable tolling is an exception to the rule, and should therefore be used only in exceptional circumstances." Motley v. United States, 295 F.3d 820, 824 (8th Cir. 2002) (citation and internal quotation marks omitted). Campis must establish two elements for equitable tolling to apply: (1) that he has pursued his rights diligently, and

---

[4]   The two cases reaching a contrary conclusion are unpersuasive. See Headley v. Church of Scientology Int'l, No. 09-3987, 2009 U.S. Dist. LEXIS 131766, at *18-19 (C.D. Cal. Aug. 12, 2009) (applying the Ninth Circuit's "manifest injustice" standard in determining that TVPRA amendment retroactively applied); Camayo v. John Peroulis & Sons Sheep, Inc., Nos. 10-772, 11-1132, 2013 WL 3927677, at *2 (D. Colo. July 30, 2013) (determining summarily that applying the TVPRA amendment would not have an impermissible retroactive effect).

10

(2) that "some extraordinary circumstance stood in [his] way." Firstcom, Inc. v. Qwest Corp., 555 F.3d 669, 675 (8th Cir. 2009).

Campis argues that tolling is warranted because fear of retaliation prevented him from timely pursuing his civil remedies. The allegations, however, do not support a finding that Campis was physically or psychologically prevented from filing suit earlier. Each year, Campis traveled back and forth between Mexico and the United States. During his extended absences from defendants, Campis had the physical freedom to seek legal advice and assistance. Indeed, Campis met officials at the U.S. Consulate during the relevant period, but chose not to share his circumstances. The allegations also support a finding that Campis was psychologically capable of advocating for himself and others, even in defendants' presence. During his employment with defendants, Campis confronted Little on more than one occasion to ask for better working and living conditions. Campis even remained in defendants' housing for several months despite Little's demands that he leave. Furthermore, Campis's fear did not prevent him from reporting defendants to the DOL in 2008 or from working with the U.S. government to secure a visa. These acts evince a sophistication and courage that undermine Campis's argument that extraordinary circumstances rendered him incapable of filing suit until six years after he severed his relationship with defendants.

11

In so ruling, the court does not question or minimize the psychological impact of human trafficking. Under the facts alleged, however, equitable tolling is not warranted.[5] Cf. Siddiq, 810 F. Supp. 2d at 133-34 (allowing discovery on equitable tolling because plaintiff was a minor when trafficked into the United States, held captive as a domestic servant for nearly twenty years, not permitted to learn English, and physically and psychologically abused).

**III.   State-Law Claims**

Defendants argue that Campis's state-law claims are time barred under the applicable six-year statutes of limitations. See Minn. Stat. § 541.05(1) (unjust enrichment and breach of contract); § 541.05(5) (negligence and vicarious liability); § 541.05(6) (fraud and fraudulent inducement); and Minn. Stat. § 628.26(d) (labor trafficking). Campis does not dispute that the six-year provisions apply, but responds that his claims are timely because the limitations periods did not accrue until he left Minnesota on March 12, 2008. A statutory limitation period begins to run when "the cause of action accrues." Minn. Stat. § 541.01. "A cause of action accrues when all of its elements exist to the extent that

---

[5] Campis requests discovery on the issue of equitable tolling. Given the specificity of Campis's allegations, discovery will not yield a different result.

12

the claim could withstand a motion to dismiss for failure to state a claim upon which relief can be granted." Noske v. Friedberg, 656 N.W.2d 409, 412 (Minn. Ct. App. 2003).

The allegations establish that Campis had potentially viable claims against defendants long before March 12, 2008. Although defendants continued to engage in the alleged conduct over a period of years, the offending conduct began near the outset of Campis's relationship with defendants and continued throughout his time in the United States. As such, Campis's claims accrued before March 12, 2008, and are untimely.

Campis alternatively argues that the limitations periods should be equitably tolled. The standard for equitable tolling under Minnesota law is similar to federal law. See Ochs v. Streater, Inc., 568 N.W.2d 858, 860 (Minn. Ct. App. 1997) (holding that in determining whether to apply equitable tolling, the court will examine whether (1) circumstances beyond the plaintiff's control prevented him from filing the action and (2) tolling will prejudice the defendant). For the reasons already stated, the court also declines to equitably toll Campis's state-law claims.

Campis also argues that his state-law trafficking claim should be tolled under the continuing violation doctrine. "The continuing violation doctrine is most commonly applied in discrimination cases involving wrongful acts that manifest over a period of time, rather

13

than in a series of discrete acts." Davies v. W. Pub. Co., 622 N.W.2d 836, 841 (Minn. Ct. App. 2001).

Even assuming the doctrine applies to the trafficking statute, the allegations do not support its application here. Although Campis alleges a common course of conduct by defendants, the alleged acts are discrete and separate instances of trafficking. Each December Campis traveled back to Mexico, and each April defendants arranged for his return to the United States. As a result, the continuing violation doctrine does not apply to Campis's state-law trafficking claim.

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that:

1. The motion to dismiss [ECF No. 17] is granted; and
2. The case is dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: September 22, 2014

s/David S. Doty<br>
David S. Doty, Judge<br>
United States District Court